VEOLAY, INC., J. E. BERNARD & CO., INC. *v.* UNITED STATES (No. 3846) [1]

[1] T. D. 47766.

United States Court of Customs and Patent Appeals, June 10, 1935

*Curie, Lane & Wallace* (*Thomas M. Lane* of counsel) for appellants.
*Joseph R. Jackson*, Assistant Attorney General (*John F. Kavanagh*, special attorney, of counsel), for the United States.

[Oral argument April 17, 1935, by Mr. Lane and Mr. Kavanagh]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

GARRETT, Judge, delivered the opinion of the court:

We have here an appeal in a reappraisement proceeding wherein the Third Division of the United States Customs Court, one judge dissenting, affirmed the decision of a single judge of that court, sitting in reappraisement, sustaining the appraised values found by the local appraiser of certain perfumeries imported from France during the year 1929 and entered under the Tariff Act of 1922.

The appraisal by the local appraiser was made under section 402(b) of the Tariff Act of 1922, the "foreign value" subsection, and there was included, as a part of the value, a 12 per centum tax levied by the French Government, as hereinafter more particularly described, upon such or similar perfumeries when sold for consumption in France.

Section 402(b) reads:

The foreign value of imported merchandise shall be the market value or the price at the time of exportation of such merchandise to the United States, at which such or similar merchandise is freely offered for sale to all purchasers in the principal markets of the country from which exported, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings of whatever nature, and all other costs, charges, and expenses incident to placing the merchandise in condition, packed ready for shipment to the United States.

It is conceded that the French tax was not levied upon exported perfumeries and that the matter of export value is not here involved. The sole question to be determined is whether the tax was properly included as a part of the foreign value of the merchandise for duty purposes.[1]

The third of what may be called the formal findings of fact by the appellate division, which is the decision before us for review, reads:

(3) The price at which such or similar merchandise was freely offered for sale to all purchasers in the principal markets of France on the dates of exportation, in the usual wholesale quantities and in the ordinary course of trade, including the cost of all containers and coverings incident to placing the merchandise in condition, packed, ready for shipment to the United States, was the value found by the trial court, including a luxury tax of 12 per centum of the retail value of the merchandise in France.

It will be observed that the finding is stated substantially in the terms of section 402 (b), *supra,* and it amounts in truth to a mixed finding of fact and law.

However, there are other findings of fact not formally stated as such which are binding upon the court if there be any substantial evidence to support them. It may be here said that the trial judge and the majority of the appellate division seem to be in substantial accord as to the facts, but upon certain matters of law the two judges of the appellate division who affirmed the trial judge seem not wholly to have agreed. In any event, each wrote a separate opinion, emphasizing the points, respectively, regarded as controlling.

In the latter part of 1917 the French Government imposed what was called a luxury tax of 10 per centum of the retail price upon perfumeries and certain toilet preparations, the charge to be paid *by the consuming purchaser* at the time such purchaser paid, in whole or in part, for the merchandise. It seems that the purchaser was to be given a receipted bill to which stamps were affixed as evidence of the payment of the tax.

Subsequently, in 1920, the law was repealed and there was substituted for it another act which made provision for the payment of a 10 per centum tax on the retail price, *by the retailer,* the tax apparently being paid upon the retailer's general retail turnover without any requirement for the use of stamps upon the purchaser's receipted bills.

It is conceded that under the administrative practice of the United States customs officials, relative to perfumeries imported while the French acts of 1917 and 1920 were in force, the tax so imposed, and so paid in France, upon the retail price of perfumeries sold in France

[1] The litigation on this tax has been long in progress, and the record is quite voluminous. One phase of the matter, not affecting the merits, was disposed of by this court in *Veolay, Inc., J. E. Bernard & Co., Inc.,* v. *United States,* 21 C. C. P. A. (Customs) 268, T. D. 46804, and the instant appeal is from the final judgment rendered upon the new trial which followed the remand there made.

was not included in the appraised value of such merchandise when imported into this country.

The last-mentioned French act remained in force (being amended in March, 1924, to increase the tax to 12 per centum) until April 4, 1926, when it was supplanted by another act, the provisions of which are here of immediate concern. This act was embraced in a codification promulgated by decree of the French Government December 28, 1926. From this decree the hereinafter quoted excerpts are taken. The French laws usually are referred to herein as "acts."

The brief on behalf of appellants states, without contradiction on the part of the Government, that during the first three years of the life of the act of 1926 our appraising officers did not include the tax in the appraised value. Beginning about June 1, 1929, however, they began to include it and continued so to do until April 26, 1930, when the French act of 1926 was repealed and the act of 1920 restored, following which the practice of not including it was resumed.

Numerous importations were made during the period from June 1, 1929, to April 26, 1930, in the appraised value of which the tax was included, and the consolidated cases here before us are stated to be test cases.

The material provisions of the 1926 French act are embraced in the following excerpts from the decree. As quoted by the court below, they read:

ART. 147. Perfumery and toilet products, * * * are subjected to a tax based upon the retail sale price, the inscription of which price is required on the labels in legible characters. This tax is collected in conformity with the following tariff:

* * * * * * *

Products of which the retail sale price exceeds Frs. 10.00; 60 centimes per 5 francs or fraction of 5 francs

* * * * * * *

The boxes, bottles or packages containing the products subject to tax may not be put into commerce to be offered for sale or sold without having affixed stamps forming seals and showing the payment of the tax. These stamps are sold by the administration of the indirect taxes and affixed through the care of the manufacturers before the merchandise leaves the factory and through the importers before any circulation in French territory or at the latest before leaving a storage in which the products would have been placed under the lien of an "acquit-a-caution."

* * * * * * *

The affixing of stamps may be dispensed with in the case of products made by industrials having an individual permit from the administration. * * * In this case, the tax is collected monthly at the rate of 12 percent on the total amount of deliveries calculated upon the retail sale prices.

The clause in paragraph 3, *supra*, reading "and through the importers before any circulation in French territory" has reference to importations made into France. Since that clause has no relevancy here, it will be disregarded in analyzing the act.

From the foregoing it will be observed that in all cases and under all the acts, the tax, based upon value, was levied upon the retail sale price, and under the act of 1926 two general methods of payment were provided. The first method was by the use of stamps, as provided in the third quoted paragraph, while the second method, provided in the fourth quoted paragraph, seems to have contemplated payments in cash without the use of stamps.

From the third quoted paragraph, it will be further observed that, in those instances where stamps were utilized, either of two plans for their attachment was permitted.

First, it was permitted that the stamps be affixed by the manufacturers or, to use the exact words of the act, "through the care of the manufacturers" before the goods left their factories.

Second, it was permitted that goods be placed in storage "under the lien of an 'acquit-a-caution'," without being stamped, but before leaving such storage it was required that the stamps be affixed.

It seems quite clear from the act that wherever and by whatsoever agency the stamps, which evidenced payment of the tax, might have been placed upon the boxes, bottles or packages containing the perfumery, they had to be attached before it was permitted that the products be "put into commerce to be offered for sale or sold."

The fourth paragraph, *supra*, prescribing the conditions under which stamps might be dispensed with is somewhat more difficult to construe, but its fair meaning seems to be that it rendered possible the putting of products into commerce by the "industrialists" who made them (that is, as we understand it, by the manufacturers) without the tax thereon actually having been paid to the Government in advance, but in such cases the industrialists, or manufacturers, had become liable for such tax and the French Government regularly collected from them the amount due upon whatever deliveries had been made during the month preceding collection.

The difference between the respective transactions would seem to be that in cases where stamps were used the tax *was actually collected* by the Government before the products were put into commerce, while in cases where stamps were not used the tax had *accrued* before they were put into commerce and there was a fixed liability upon the manufacturer for its payment.

Considering first the plan under the fourth paragraph, it seems clear to us that there is no difference in principle between it and the plan of the German tax upon illuminants involved in the case of *Hugo Reisinger (Inc.) et al.* v. *United States*, 20 C. C. P. A. (Customs) 67, T. D. 45683.

There the act of the German Government definitely provided that the tax imposed was "incurred upon the entering of the illuminants into the open market," and defined the tax debtor as "whosoever introduces illuminants into the open market." Here, in those cases where the perfumery was sold without being stamped, the French act did not specify the manufacturer as the tax debtor, but by the very terms of the act he became such, and the tax accrued and the payment thereof had to be made, or assured, before the entrance of the merchandise into the open market.

Were the plan provided in the fourth paragraph of the 1926 act the only plan, it is our opinion that there could be no serious question as to the case at bar being controlled by the *Reisinger* case, *supra*.

However, attention must be given the other plan whereunder stamps were used.

As already has been indicated, it is fairly deducible from the text of the act itself that the law did not make mandatory the affixing of stamps evidencing payment of the tax by the manufacturers, or "through the care of the manufacturers", before the goods left the factory, *in all cases*. An alternative plan was provided whereunder the goods could be placed in storage under the lien of an acquit-a-caution, without being stamped, but stamping was mandatory before the goods could be withdrawn from such storage to be offered for sale or sold.

The act itself sheds little light upon just what storage places were eligible so to receive the merchandise, and there are conflicts in the testimony of persons testifying as expert translators relative to the precise meaning of "acquit-a-caution." The term is said not to have an exact English equivalent. Also, the question of who was responsible for affixing the stamps upon those products placed in storage under the lien of an "acquit-a-caution" is not made clear in the act itself, and this presents a somewhat controversial point in the case.

It is perfectly clear that upon goods leaving the factory without going into the storage contemplated in the act, the stamps had to be affixed "through the care of the manufacturers," but whether the manufacturers' responsibility continued after the placing in storage is not clear from the statute taken alone.

However, evidence was presented relating to this, and the Appellate Division of the United States Customs Court (in the opinion by Keefe, J.) said:

A reading of the evidence as a whole impresses us firmly with the belief that: First, it was the intent of the French Government to make the manufacturer of perfumery and toilet preparations responsible to the Government for the payment of the tax; second, two methods of payment were open to manufacturers, (a) by the affixing of stamps purchased from the tax department before the products left the factory, or by (b) an account with the Government whereby

the amount due for tax upon shipments made were entered in books kept for that purpose; third, in certain circumstances the tax could be passed on to their purchasers, first, in the case where the purchaser had an account with the Government whereby an accounting is made monthly, and second, by means of the lien of an "acquit-a-caution"; fourth, where the purchaser had an account with the Government, the manufacturer might bill his goods at wholesale prices without in any way showing the amount of the 12 per centum tax, but in all such cases, the shipment is made under a lien of an "acquit-a-caution"; fifth, the liability of the manufacturer to the Government for payment of the tax ends upon the discharge of the lien of "acquit-a-caution" and such discharge is given only when the tax is paid before the goods enter the uncontrolled channels of trade, or when the merchandise is transferred to an account of and is shown on the books of the consignees who have an individual permit from the administration to pay the tax monthly. Those dealers having such an account were considered by the Government to be manufacturers. Thus the manufacturer must either pay the tax before the merchandise leaves his factory unless he has a permit allowed under the law to pay it monthly. In all events, the manufacturer is at all times primarily liable and responsible for the payment of the tax.

The fifth finding, just quoted, appears to us to be more a finding of law than of fact, and there is at least a doubt on our part as to whether when goods were shipped under the lien of an "acquit-a-caution," the actual manufacturer was not released from his obligation to the French Government, but even if this were so, an official document of the French Government which is in evidence, and which was evidently issued for the instruction of those administering the perfumery tax law, seems to render this matter one of little importance. An excerpt from the document reads:

* * * all the dealers (retailers or others) who sell articles with their own brand, whether they receive them bearing labels with their name, or whether they affix these labels themselves in modifying or not the preparation of the products, must be compelled to take the position of manufacturers and will be considered as such in respect of the tax.

It is of aid to this court, in interpreting some of the expressions of the official French documents, to remember that, as shown by the record, perfumery industrialists in France often manufacture particular kinds of perfume for special customers, and also often affix particular brands to perfumes sold to special customers, probably both wholesalers and retailers. In the case of these particular kinds or brands the shipments are made only to those customers for whom they are prepared. It is not unreasonable to surmise that much of the perfumery which went into storage under the lien of an "acquit-a-caution" consisted of these specially prepared types, but this fact is referred to here merely as an aid in interpreting expressions in the French documents, and not as an element to be considered in determining the law applicable in this case, because we are, for the purposes of the case, giving appellants the benefit of the doubt as to the proper statutory construction, and are assuming that, in cases

where shipments were permitted without stamps being affixed, the actual makers ceased to be liable, full responsibility therefor passing to the consignee, and such consignee became himself a "manufacturer" for the purpose of the act.

But, after conceding this, we must disagree with the statement in the brief of appellants, made in connection with the effort to distinguish the French tax here involved from the German tax involved in the *Reisinger* case, *supra*, that "The French *law* * * * permitted circulation of the perfumery *in commerce* with *suspension* of tax liability, * * * ." (Italics ours.)

As we interpret the act, it provided directly to the contrary. The first sentence of the third quoted paragraph, *supra*, most explicitly declared:

> The boxes, bottles or packages containing the products * * * may not be *put into commerce* to be offered for sale or sold without having affixed stamps forming seals and showing the payment of the tax. (Italics ours.)

This seems to us to be the heart of the paragraph.

In the sense that the merchandise might have been shipped from one point to another without the tax having been paid, it may have been in "circulation," but that was not "a circulation in commerce" according to our understanding of the general meaning of the term commerce, and certainly not according to its definition in the French act—"to be offered for sale or sold."

Neither are we able to deduce from the act where there was ever any "suspension of tax liability." The parties liable as tax debtors might have shifted, but always there was some one directly liable, the liability being definitely fixed as to time, that is before the merchandise could be offered for sale or sold.

The record has been quite carefully examined with respect to the evidence upon which the tribunals of the Customs Court predicated their findings of fact.

The document principally relied upon by appellants is an affidavit made jointly by four members of the French legal profession in which there are recitations of alleged practices in France under the French law, together with their views as to the proper construction of the law.

That this affidavit was admitted and weighed by the tribunals of the Customs Court appears from all their opinions of record. Apparently but little weight was given it by the majority of the appellate division, especially such parts of it as were merely matters of opinion, and the failure or refusal so to do is assigned as error.

This does not constitute an error of law.

As this court has frequently had occasion to point out, the tribunals of the United States Customs Court are the exclusive judges as to what weight shall be given evidence presented in reappraisement pro-

ceedings in the form of affidavits and other forms made admissible by the statute (section 501, Tariff Act of 1922), and when it appears that they have considered it, it is not the province of this court to pass upon their conclusion concerning its weight. *Amtorg Trading Co.* v. *United States*, 21 C. C. P. A. (Customs) 532, 542, T. D. 46975, with cases there cited.

In our opinion, there is no material finding of fact by the appellate division, or by the trial judge whose decision was affirmed, that is not supported by substantial evidence.

Appellant has emphasized the fact that the French act specifically makes the tax a tax upon *retail* sales prices, thereby evidencing the intent that it should be a tax upon the consumer and not upon the producer or wholesaler, and it is urged that it should not be included in the foreign wholesale selling price—

unless it is a tax necessarily absorbed by and included in the wholesale price of the seller.

It is pointed out that, in substantially every instance shown, the invoices to French purchasers billed the tax as a separate item, and argument is based upon the state of the law in the United States respecting excise taxes levied here upon the sales of articles, although the brief quite frankly states that our domestic policy is not necessarily controlling in the construction of foreign laws.

Congress provided in section 619, title IV of the Revenue Act of 1932, 47 Stat. 267:

In determining, *for the purposes of this title*, the price for which an article is sold, * * * there shall be excluded the amount of tax imposed by this title, whether or not stated as a separate charge. (Italics ours.)

The Revenue Act of 1932 was the first general internal revenue measure to pass the Congress after the decision, rendered in January 1929 by the Supreme Court of the United States, in *Lash's Products Co.* v. *United States*, 278 U. S. 175.

That decision related to a tax imposed by the Revenue Act of 1918 (in fact, enacted February 24, 1919, c. 18, §628, 40 Stat. 1057, 1116) in which there was imposed on—

soft drinks, sold by the manufacturer, * * * in bottles or other closed containers, a tax equivalent to 10 per centum of the price for which so sold.

It appears from the opinion of the court that the Commissioner of Internal Revenue had promulgated a regulation to the effect that when a manufacturer billed the tax to a customer as a separate item, such tax was not to be considered as an increase in the sale price.

Lash's Products Co. paid a tax calculated at 10 per centum of the sum actually received by it for goods sold, and notified its customers beforehand that it had done so, but apparently did not bill the tax as a separate item. Obviously, the amount of the tax was charged to and collected from the customers, and when the manufacturer paid

it upon the basis of the full price actually charged the customers, it resulted in the Government receiving a tax upon a tax.

The court construed the act to mean that it was intended that the Government should collect a tax upon the amount of the tax, saying, in substance, that the tax was laid and remained upon the manufacturer and on him alone; that the purchaser did not pay it; that he paid the seller more for the goods because of the seller's obligation, "but that is all."

In construing the section there at issue, the court indicated that, as an original proposition, it might not have agreed to the validity of the regulation whereby a manufacturer, when he billed the tax separately, was relieved of paying tax upon tax, but since that was not involved in the case, Lash's Products Co. not having billed the items separately, the point was not formally adjudicated.

It is suggested that the provision quoted, *supra*, from the Revenue Act of 1932 was probably inserted as a result of the decision of the Supreme Court in the *Lash's Products Co.* case, *supra*.

However this may be, we do not feel that a congressional intent as to *domestic* policy, expressed in 1932, may properly be held to bear upon a question of *foreign value* of imported merchandise arising in 1929, and notwithstanding the fact that a regulation, as to the validity of which the Supreme Court expressed doubt, took separate billing into account in the matter of domestic excise or sales taxes, it does not seem to follow that a similar rule should be controlling here.

The appellate tribunal of the Customs Court in the case before us, following the trial judge, found that in the ordinary course of trade in perfumeries in France, the actual manufacturer, or some one whose status was defined by French law or regulation as being that of a manufacturer, was primarily responsible for and, in fact, paid the tax, and the amount thereof was included in the price of the goods when sold in France.

Ultimately an amount equal to the amount of the tax was paid by consumers when they purchased the goods, not (as apparently was the case under the French law of 1917) as a tax, but as a part of the total sum paid for the goods. As was said in the *Lash's Products Co.* case, *supra:*

The amount added because of the tax is paid to get the goods and for nothing else.

By the provisions of the German act involved in the *Reisinger* case, *supra*, it was required that the tax should be listed separately upon the invoice. Of this, we there said:

The fact that the tax was required to be separately listed upon the invoice from the tax debtor to the purchaser does not change the law as to its being a tax.

We do not find any requirement in the French act now before us as to the listing of the tax separately, or in any other manner. That we

assume was simply a matter of trade practice. The principle above announced in the *Reisinger* case, *supra*, seems entirely applicable here.

It has been hereinbefore said that appellants place much emphasis upon the fact that the French act bases the tax upon *retail* sale price.

It is not seen wherein this affects the question of law involved. The Government of France saw fit to take that as a standard. It might have taken any other price which it saw fit. It is not the standard which is of importance, but the matter of payment. This we have discussed sufficiently.

Neither do we feel that the reimbursement of taxes collected, under certain conditions prescribed by the French law, may be considered as bearing upon the issue.

It is felt that upon no sound theory can the instant case, upon the facts, be distinguished in principle from the *Reisinger* case, *supra*.

Many other authorities were discussed in the briefs before us, but a review of them here is deemed unnecessary. None cited is inconsistent with the *Reisinger* case, *supra*, when the facts are correctly understood.

The judgment of the United States Customs Court is *affirmed*.